AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | DOCKET NO. |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>GABRIEL MARTIN REED | |
| | MAGISTRATE'S CASE NO. 17MJ00870 |

Complaint for violation of Title 18, United States Code, Sections 1343 and 1028A

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALKA SAGAR | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>2015 to the present | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

**See Attachment**

FILED
CLERK, U.S. DISTRICT COURT
APR 19 2017
CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

LODGED
2017 APR 19  PM 12: 21
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint.)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Ryan Heaton |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>ALKA SAGAR | DATE<br>April 19, 2017 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Poonam G. Kumar (x0719)  REC: Detention          Warrant

**Attachment**

## Count One (18 U.S.C. § 1343)

Beginning in or around 2015 and continuing to the present, defendant GABRIEL MARTIN REED ("defendant REED"), knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud M.C. as to material matters and to obtain money and property from M.C. by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts. For the purpose of executing this scheme and in an essential part of the scheme, on or about October 2, 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendant REED, transmitted and caused the transmission of a wire communication in interstate and foreign commerce of approximately $50,000 from a J.P. Morgan Chase bank account an LLC controlled by M.C. to a Wells Fargo bank account ending in 6140 held in the name of defendant REED.

## Count Two (18 U.S.C. § 1028A)

On or about December 1, 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendant GABRIEL MARTIN REED knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, that is, the name of F.G., during and in relation to a felony violation of Title 18, United States Code, Section 1343, Wire Fraud, as charged in Count One.

## AFFIDAVIT

I, Ryan Heaton, being duly sworn, declare and state as follows:

## INTRODUCTION

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since September 2005.  I am currently assigned to a Los Angeles Field Division White Collar Crimes Squad, which is responsible for investigating financial institution fraud, including bank fraud, wire fraud, mortgage fraud and identity theft.

2.     Since becoming an FBI Special Agent in 2005, I have received 18 weeks of formal training at the FBI Training Academy in Quantico, Virginia.  I have received training in interviewing, financial analysis, surveillance, and other investigative techniques.  During the time I have been employed by the FBI, I have participated in investigations relating to wire fraud, mail fraud, and various types of financial institution fraud.  I have participated in many aspects of criminal investigations including, but not limited to, reviewing evidence, conducting physical and electronic surveillance, working with informants, and executing search and arrest warrants.  Additionally, I have interviewed defendants, informants, and victims who had personal knowledge regarding the investigation in which I have been involved.

## PURPOSE OF AFFIDAVIT

3.     This affidavit is made in support of a criminal complaint and arrest warrant for GABRIEL MARTIN REED ("REED")

1

for violations of Title 18, United States Code, Sections 1343
(Wire Fraud) and 1028(A)(Aggravated Identity Theft).

     4.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
warrant and does not purport to set forth all of my knowledge of
or investigation into this matter.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only.

                    **SUMMARY OF PROBABLE CAUSE**

     5.   As set forth in further detail below and based on the
information that I have obtained during the course of this
investigation and my training and experience, I am aware of the
following:

          a.   Between at least approximately June 2008 and
December 2016, REED represented himself as a promoter and
organizer of events such as concerts by Bon Jovi, Van Halen, and
Guns N' Roses, musical tours called Metal All-Stars and Titans
of Rock, and wrestling matches for the World Wrestling
Entertainment ("WWE").  REED advertised the events under his
company Gabe Reed Productions, also referred to herein as GRP.

          b.   During this same time frame, REED solicited
individuals to invest money which he claimed would be used to
fund the events that he promoted.  REED has successfully

                              2

organized concerts in the past and relied on that reputation to entice some individuals into investing in events.

      c.   To date, several individuals who gave REED funds for his events and concerts have reported that REED did not use the funds as he originally promised. Specifically, REED lured investors in by touting longstanding relationships with musicians, showing props from alleged previous tours, and in some instances, creating fabricated financial records related to music events. REED told investors that certain artists had agreed to participate in events and that their funds would be used for the events and they would receive a profit on those funds. Rather than using the funds for the events, REED would use the investors' funds for personal expenses. In some instances, the artists had never agreed to participate in the events for which REED solicited investments and the events never occurred. After sending the money to REED, the investors regularly received messages from REED that the events were delayed. The loss attributable to 15 of REED's victims identified to date totals over $1.4 million.

## STATEMENT OF PROBABLE CAUSE

### A.   Background on REED

6.   Based on incorporation records from Texas, I know that Gabe Reed Productions was incorporated in Texas and listed an address in Dallas, Texas. Based on documents provided by REED's victims, I know that Gabe Reed Productions is also associated

with an address on Sunset Boulevard in West Hollywood, California.

7.    Based on interviews with witnesses, I know that, during a portion of the relevant time period and at least in or around 2015, REED resided in Malibu, California.  Based on witness interviews, text messages received from M.C., a victim of REED's, and documents provided by L.Z., a victim of REED's, REED resided in Los Angeles, California beginning at least as early as March 2016.[1]

8.    Based on documents received from witnesses and victims, I know REED used an AOL email address ("REED AOL Account") to communicate with his investors and others.  Based on my review of subscriber records, I know that the account records reveal that the account was created in July of 2000 and list Gabriel Reed as the subscriber with a physical address in Malibu, California.  This physical address matches the address where I believe REED resided in or around 2015.

**B.    M.C. invested $100,000 with REED for Titans of Rock tour**

9.    On October 5, 2016, I interviewed M.C. and learned the following:

a.    M.C. owns commercial property, acts as a landlord, and is involved in manufacturing.  M.C. stated he did not have experience in the music industry or putting on music events.

---

[1] Based on information from M.C., I understand that REED may have moved to Las Vegas, Nevada at least as of April 7, 2017, if not some point earlier.

4

b.   M.C. met REED in or around 2013 through a mutual friend at a party M.C. threw on his boat.

c.   In or around the fall of 2015, REED pitched M.C. on investing in a music tour called the Titans of Rock.   REED said M.C. could own a percentage of the tour if he made an investment.   REED told M.C. that if he invested in November then M.C. could be repaid by February.   REED asked M.C. for an investment of $250,000.

d.   M.C. did not commit right away, but continued to socialize with REED.

10.   Based on my review of an email provided to me by M.C., I learned that REED emailed M.C. from the REED AOL Account on September 24, 2015 regarding the Titans of Rock tour.

a.   In relevant part, the email stated:

Per our discussion, I am doing the Titans of Rock tour in the spring of 2016.

The basic deal is that an investor would come in with 1m which is used to cover the main stars' initial deposits. Once they are secured I will sell the shows to various promoters for 550k each which will cover the 1m put in by your group and the remaining tour expenses. The profits would come from the net of the promoter fees (after expense) and the merchandise, meet & greet sales and sponsorships which we own 100% of. The net to the investor would be 1,969,870 plus the 1m put in which would be 50% of the net. As I said a 250k investment would be a 1/6 (roughly

16.7%) share which would net 660k. Attached are the
detailed numbers.

   b.   The email included a line up for the tour, which
included, among others, G.S., R.S., D.F., A.F., V.A., J.M., and
O.P., all well-known musical performers.  Many of these
performers were unaware that REED was using their names to
defraud people.

   c.   The email also stated that a fourth star could be
brought on, but REED stated they "should move with what we have
at this point."

   d.   Attached to the email were images that appeared
to be promotional material for the tour that contained the tour
name, the performers' names (including G.S., R.S., and D.F.),
and in one instance, their likenesses.  Also attached to the
email was a budget that listed expenses as well as a projected
net profit of $3,939,740 from the tour.

   11.  M.C. provided me with a copy of the contract between a
Limited Liability Corporation I understand M.C. owns ("M.C.'s
LLC") and Gabe Reed Productions.  While the copy M.C. provided
was unsigned, M.C. stated that a copy was, in fact, executed.
The contract covered the 2015/2016 touring season of the Titans
of Rock in Europe, South America, and Asia.  The contract
provided that, in exchange for M.C. LLC's investment of
$100,000, it would receive an 8.5% share of an LLC created for
the Titans of Rock Tour.  To this LLC, GRP would contribute the
revenue generated from the tour, including, among other things,

6

the "[r]evenue generated by all performance and/or concert and/or touring fees for the 2015/2016 touring season."

12. Based on my interview with M.C., I learned that, after executing the contract, M.C. invested $100,000 with REED. Based on my interview with M.C., I learned that M.C. expected the invested funds to be used to pay artists and that the tour was to occur in the spring of 2016. M.C. expected to be repaid before the tour occurred, because REED stated that the tour would be sold to promoters in advance.

13. Based on my interview with M.C. and my review of bank records from Wells Fargo, I learned that M.C. provided the money to REED through two wire transfers of $50,000 each on October 2 and 6, 2015. M.C. wired the funds from a bank account under his control, specifically a Chase bank account in the name of M.C.'s LLC, to a Wells Fargo Bank account ending in 6140 in the name of REED ("REED Account 6140").

14. Based on my review of records from Wells Fargo, I learned that the October 2 and 6, 2015 wire transfers from the Chase bank account in the name of M.C.'s LLC both have a Fed#. Based on my training and experience, I understand that wire transfers that have Fed#s are frequently processed through FedWire, which is a real-time gross settlement funds transfer system. Based on my email communications with an employee of the Federal Reserve Bank of New York, I understand that from April 27, 2009 to approximately November 10, 2014 all FedWire wire transfers were processed through New Jersey and that from approximately November 10, 2014 to August 10, 2016 all FedWire

7

wire transfers were processed through Texas.  Therefore, there
is probable cause to believe that the two $50,000 wires
transferred from M.C. to REED Account 6140 involved an
interstate wire communication.

15.  I obtained account records for REED Account 6140 from
Wells Fargo.  Based on my review of these records, I learned:

a.  The account was opened on April 15, 2015 and the
only signatory was REED.

b.  At the beginning of the day on October 2, 2015,
the account was overdrawn in the amount of $1,148.27.

c.  Later in the day on October 2, 2015, there was an
incoming wire from M.C.'s LLC for $50,000.  There was another
wire from M.C.'s LLC for $50,000 on October 6, 2015.  Based on
the facts set forth above, I believe these wire transfers
represent M.C.'s initial investment with REED.

d.  Following these incoming wires, I observed a
number of debits, including, but not limited to, checks drawn on
the account with memo lines that appear to refer to child
support, a birthday, and "Somewhat Act Settlemat[sic]", as well
as numerous withdrawals from ATMs and bank branches/stores in
various amounts.  I also observed small purchases at Spirit
Halloween, Ruth's Chris Steakhouse, the Four Seasons Beverly
Hills, and Mr. Chow of LA Beverly Hills.  Based on my review of
the bank records, by December 2015, M.C.'s investment of
$100,000 had been depleted.  During this time period, I was
unable to identify the payment of any expenses related to a
concert or tour.

8

C.    Representatives state artists never booked for Titans
of Rock tour

16.    On December 12, 2016, I interviewed a New York
attorney who represents G.S. and learned the following:

a.    The attorney helped negotiate a deal for G.S. to
perform as a part of the South America Rock N' Roll All Stars
Tour with REED in 2012.  G.S. was paid for the tour upfront.
The attorney did not recall G.S. mentioning any issues with REED
or with the 2012 tour, but he did hear rumors that other parties
involved in the tour were not paid.  The attorney did not know
exactly when G.S. met REED nor when they began communicating.

b.    In or around 2015, G.S. learned that REED used
G.S.'s name to obtain money and informed the attorney who
subsequently sent a cease and desist email to REED on July 16,
2015.  REED did not respond to the email from the attorney.  The
attorney did not know specifically what REED was doing with
G.S.'s name and after this email was sent, REED contacted only
G.S. and not the attorney.

c.    The attorney stated that, to his knowledge, G.S.
and REED never reached an agreement to perform in a 2015 tour
organized by REED.  It would have been unusual for G.S. to sign
an agreement without the attorney's involvement and especially
not in a situation where G.S. had already asked the attorney to
negotiate with REED.

d.    The attorney stated he did not believe G.S.
signed anything in relation to a Titans of Rock tour.

17.  Based on emails sent to the FBI by G.S.'s attorney, I
learned the following:

a.  In or around August 2015, REED (from the REED AOL
Account) emailed G.S. several times regarding a Titans of Rock
tour.  During the course of this correspondence, G.S. told REED
on August 17, 2015 that "Everything is on hold now . . .  We
will have to wait until my schedule is clear."  REED then
responded stating that "if we don't start moving soon the
November/December time frame may have to move into early 2016
which may work better at any rate."  G.S. then responded stating
"We will all have to wait."  On September 1, 2015, REED emailed
G.S. stating "Any update on your schedule?  I would like to move
forward with executing the contract and deposit."  G.S.
responded "Sorry, it will have to wait.  We are shortly leaving
for Australia to tour and need to solidify New Year's during
schedules, before we discuss anything else."  On October 1,
2015, REED again followed up and asked whether "we can do Titans
next spring?".  G.S. responded "Apologies.  We are on tour in
Australia.  This will all have to wait, until I have a chance to
more clearly study this, when my head is clear."[2]  As set forth
above, M.C.'s investment came in after G.S.'s emails with REED.

18.  On December 5, 2016, I interviewed a booking agent who
represented O.P. and R.S., two artists REED represented to M.C.

---

[2] The email indicates that G.S.'s response was dated
September 30, 2015.  Given that REED's email to which G.S. was
responding was dated October 1, 2015, I believe there was likely
a time zone adjustment which accounts for the discrepancy in
dates.

were to perform in the Titans of Rock tour.  I learned the following from the booking agent:

a.   The agent was vaguely familiar with REED.  He also said the Titans of Rock tour rang a bell for him and that his recollection was that R.S. and O.P. had passed on that event.  His last communication with REED would have been around the time he last emailed REED, in or around February of 2016. The booking agent reiterated that no agreement was reached for R.S. or O.P. to play on the Titans of Rock tour.  To the agent's knowledge, R.S. did not ever perform in any event for the Titans of Rock.  The agent stated that other than an email exchange about R.S., he had never done business with REED.  The booking agent stated that the chances were slim to none that R.S. would have agreed to and played in a REED organized event without him knowing.

19.   On November 9, 2016 I interviewed the booking agent for D.F., a musician REED represented to M.C. would perform on the tour.  I learned the following from the booking agent:

a.   The booking agent recalled dealing with REED regarding a possible tour involving D.F.  The agent said REED made an offer, but never confirmed it.  The tour was supposed to revolve around an All-Star band, of which D.F. would be one of the members.  According to REED's proposal, the All-Star band was supposed to tour Europe and Asia.  The agent said that he had a few conversations with REED and at one point told REED D.F. was ready to accept.  D.F., before confirming, wanted to verify the other musicians that were supposed to be part of the

11

tour.  The booking agent recalled learning that, contrary to
what REED had represented, R.S. was not in the band.  REED
eventually confirmed to the agent that R.S. was not in the band
and the agent told REED D.F. would not confirm until he knew who
was in the band.  The agent never heard from REED again.

 b.   The booking agent said that a contract was never
issued and he never reached a formal agreement with REED.  The
first negotiating email exchange he had with REED was on June
11, 2015 and his email communication with REED stopped on June
13, 2015.

 c.   The booking agent said it was a misrepresentation
for REED to tell anyone that D.F. was part of the All-Star band.
This was particularly so, according to the agent, in October
2015 because he and REED were no longer communicating.

 d.   I asked the booking agent if D.F.'s name or photo
could have been used in any promotional material for the tour
with REED.  The booking agent stated that REED did not have
permission to use D.F.'s name or appearance because there would
have had to been an agreement in place first.  In such
agreements, the artist normally gets to review the promotional
material and approve it before it's used.  The deal with REED
never reached that point.

 20.  On November 4, 2016 I interviewed V.A., a musician
REED had represented to M.C. would perform on the Titans of Rock
tour.  From this interview, I learned the following:

   a. V.A. was contacted by REED via email a couple years ago to perform on a tour called the Metal All-Stars.  V.A. said the event never happened.

   b. V.A. said REED later offered him another opportunity for a Metal All-stars event, but again it was cancelled.  V.A. had heard from other performers that REED was a nightmare to work with.

   c. At first, V.A. did not recall working with REED on an event, but later clarified that he did recall playing two events that REED arranged in South America.  The events did not occur exactly as initially planned.  V.A. stated there was a lot of uncertainty as to whether the events were going to happen and the airline tickets for the performers were not purchased until the last minute.  V.A. stated that he had never been a part of event where the organizer waited so long to procure the airline tickets.  V.A. stated that he had thought the events were supposed to be part of a much larger tour, but only two events occurred.  V.A. recalled that he left to play these events in or around November 2014.

   d. V.A. said that he last heard from REED in or around April 2015.  REED contacted V.A. again for a tour that never happened.  V.A. did not recall agreeing to play an event organized by REED scheduled to take place in the Spring of 2016.

  **C. REED continues to make false representations to M.C. regarding Titans of Rock tour after M.C.'s investment**

  21. Based on emails provided to me by M.C., I learned that on December 1, 2015, REED emailed M.C. (from the REED AOL

13

Account) attaching what REED described were the "main artist agreements," which REED stated should be kept confidential. These agreements pertained to R.S., D.F., G.S., and S.N., a musician who was not included in the original list REED sent to M.C., but is otherwise well-known.

22.  Based on my review of the contract sent by REED to M.C. related to G.S., I learned that it was four pages long.  It was purportedly signed by both REED and G.S.  Based on my review of a 2012 contract relating to a Rock N' Roll All Stars tour signed between G.S. (through a corporate entity) and REED sent to me by G.S.'s attorney and referenced above in paragraph 16, I learned that the last page of the 2012 contract is identical to the one sent by REED to M.C. in December 2015, with the exception of the date of execution from the 2012 contract, which had been removed in the 2015 contract.  From my review, I believe the signatures on the two contracts to be virtually identical.

23.  Based on my review of the agreements sent by REED to M.C. in December 2015, I learned that the agreement with S.N. was on the letterhead for a company with an address in Miami, Florida ("TAT").[3]  Based on my review of the publicly available TAT website, I understand that there is an entity by that name located at the address listed on the S.N. contract and that the logo on the website appears to match the logo on the letterhead on the agreements sent to M.C.  During the course of this

---

[3] The full name of the entity has been modified in order to safeguard the identities of the individuals involved.

investigation, I interviewed the owner of TAT who stated, among other things, that she never represented S.N. and that she did not generate the agreement sent to M.C.  The owner stated she had three employees in Florida and she did not believe any of her employees would have been involved with S.N.  The owner stated that she had had prior interactions with REED in 2014 and 2015, but that their discussions involved a Hip Hop All-Stars tour.

24.  Based on emails I received from M.C., I learned that REED sent M.C. another email (from the REED AOL Account) on December 1, 2015 attaching a .pdf file.  I also learned the following:

a.  In the email, REED stated "Take a look at the attached.  I got an offer from a reliable broker to buy 5 of the 10 shows for 3.3m which take a huge load off but they can't pay until January.  Also got a Merch offer which is just ok – they will pay 250K advance on the sales.  Sending more docs shortly. Gabe."

b.  The agreement attached to the email purported to be an employment agreement between Gabe Reed Productions as legal representative of Titans of Rock and an entity acting as a purchaser of music ("IM").[4]  The agreement sets forth that IM agreed to hire Gabe Reed Productions for the Titans of Rock tour scheduled to take place in Belarus, Poland, Sweden, and Russia for a flat fee of $3,350,000.  The signature line on the

_____

[4] The full name of the entity has been modified in order to safeguard the identities of the individuals involved.

15

agreement for IM shows F.G. was to be the signatory on behalf of IM. The agreement is unsigned.

25. On January 15, 2016 and November 1, 2016 I interviewed F.G. Based on this interview, I learned:

    a. F.G. works as a musician and music producer.

    b. F.G. first met REED roughly ten years ago. F.G. understood that REED worked with G.S., who imposed REED on his associates because G.S. liked REED. F.G. stated that REED sometimes appeared on G.S.'s reality show.

    c. F.G. knew that G.S. had worked with REED on a Rock N' Roll All Star tour in South America in or around 2012.

    d. In or around 2013, REED called F.G. and told him about the Metal All-Stars tour. REED told F.G. he was no longer doing Rock and Roll All-Stars. REED wanted to know if F.G. was interested in being a part of the tour. REED and F.G. subsequently completed a letter of engagement. For this deal, F.G. brought in a partner and formed IM. F.G. and REED agreed on one contract for all of the countries in the tour for a lump sum of $1,400,000. F.G. stated that REED should have already secured the performers before his negotiations with F.G. took place. F.G. later discovered that two of the performers REED said would be part of the tour had never agreed to the tour. REED subsequently signed a new agreement with a Russian promoter to deliver a new lineup and renegotiate the fee. The promoter, F.G., F.G.'s partner, and REED also decided to set up a third party to handle the money; this third party would release funds to REED only when he gave them a bill. F.G. said the Metal All

16

Stars tour happened in or around the spring of 2014, but each show presented its own drama.

26.   I emailed F.G. the IM agreement with F.G.'s name on it that REED had sent to M.C.  F.G. said he was disgusted after reviewing the agreement and that he had no knowledge regarding the agreement.  F.G. stated that IM was not currently an operational company.

27.   Based on my interviews with M.C., I learned that sometime in early 2016, REED told M.C. that there were booking problems and the tour had to be delayed to May or June.  M.C. became frustrated as he wanted to go to some of the tour events and was trying to plan travel arrangements to coincide with the tour dates.  The tour dates kept getting delayed and eventually REED told him it was going to happen the following year.  Since REED originally told M.C. that the artists were locked in and paid, M.C. did not understand the delays and asked for his money back.  REED promised a check was in the mail to M.C., but M.C. never received a check.  REED continued to guarantee he would make M.C. whole, but, as of April 12, 2017, M.C. had not received his money.

28.   M.C. provided me with an email from July 2016 involving REED.  Based on my review of this email, I learned:

c.   The email chain purported to be between REED (using the REED AOL Account) and an individual named V.C., whose

email address was [IM]productions@gmail.com.[5]   Also copied on the email exchanges were [TAT]llc@gmail.com[6] and [JB]law@gmail.com.[7]

      d.   In the email, V.C. purportedly wrote, on July 21, 2016, in pertinent part, to REED: "We made arrangements with our bank today and the funds will be sent first thing in the morning here in Ljbuljana."   I will send the swift confirmation as soon as the bank send [sic] it out.. [sic]."

      e.   On July 27, 2016, REED wrote "I checked this evening and no money has hit my account!!   You need to get this fixed or we will move on with another promoter.   It should not take this long to pay a deposit!   Gabe."

    29.   I obtained subscriber records for the following email addresses: [IM]productions@gmail.com, [TAT]llc@gmail.com, and [JB]law@gmail.com.   For each email account, the REED AOL Account, is listed as the recovery email address.   Two of the email accounts listed different phone numbers, both of which, based on my review of subscriber records, are associated with REED.   The third email account did not have a phone number associated with it.

    30.   During the course of my interviews with the owner of TAT, referenced above in paragraph 23, I learned that the owner knew nothing about the email address [TAT]llc@gmail.com and that her entity was not an LLC.   In addition, I interviewed J.B., the

---

[5] The full name of IM appeared in the email address.

[6] The full name of TAT appeared in the email address.

[7] The full email address includes the first initial and last name of a real individual and has thus been modified to safeguard that individual's identity.

person whose name appears in the email address

[JB]law@gmail.com.   J.B. is, in fact, a real attorney and has

had interactions with REED.   J.B. stated that he has never used

the email address [JB]law@gmail.com.   F.G. similarly stated that

he has never used the email address [IM]productions@gmail.com

and that no one by the name of V.C. ever worked at IM.

31.   Based on my training and experience and my knowledge

of this investigation, I believe REED used these email addresses

and the contract with F.G.'s name on it to lull M.C. into

believing that his funds had been legitimately invested and to

delay M.C. from pursuing further legal action.

### IV.   CONCLUSION

32.   For all the reasons set forth above, I believe there

is probable cause to believe that, in violation of 18 U.S.C.

§ 1343, REED, knowingly and with the intent to deceive and cheat

and as part of a scheme and plan, made material false

representations to M.C. with regards to the Titans of Rock tour

for the purpose of obtaining money and property and that REED

caused an interstate wire communication to be used,

specifically, the wire transfer in the amount of $50,000 on

October 2, 2015 from M.C. to REED, to carry out an essential

part of the scheme.

33.   Further, based on the facts set forth above, I believe

there is probable cause to believe that, in violation of 18

U.S.C. § 1028A and during and in relation to the scheme and plan

to obtain money and property from M.C. by means of false

representations, REED knowingly transferred, possessed, and used

without legal authority the means of identification of another person, specifically, F.G.'s name as listed on the fraudulent contract sent by REED to M.C. on December 1, 2015, which REED knew belonged to a real person.

/s/
_____
Ryan Heaton, Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 19th day of April, 2017.

**ALKA SAGAR**
_____
UNITED STATES MAGISTRATE JUDGE

20